FILED IN THE U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

AUG 1 0 2026

SEAN F. McAVOY, CLERK
RICHLAND, WASHINGTON

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA

Plaintiff

vs.

DAVID MENDOZA, AYALA

Defendant

NO. 4:24-CR-06011-MKD

DEFENDANT'S MEMORANDUM IN SUPPORT OF DEFENDANTS NEW MOTION TO SUPPRESS

COMES now DefeNDANt, DAVID MeNDOZA, AYALA, BY AND through His Attorney _____, AND Provides the Following MemorANDUM IN support of DefeNDANts Motion To suppress

Dated this ____ Day of July, 2026

_____
Attorney FoR DefeNDANt

## PHASE ONE OF the Investigation:

In issuing a search warrant, a magistrate Judge must look to the "totality of the circumstances" to Determine whether the supporting affidavit establishes probable cause. Illinois v. Gates, 462 U.S. 213, 230, 103 S. Ct. 2317, 76 L.Ed.2d 527 (1983). In Determining probable cause, the magistrate should consider an informant's veracity, reliability and Basis of Knowledge to resolve the "common-sense, practical question whether there is 'probable cause' to believe that Contraband or evidence is located in a particular place." Id. The totality of the circumstances approach "permits A Balanced assessment of the 'relative weights of all the various indicia of reliability (and unreliability)" surrounding informant's tips. Id. at 234, 103 S. Ct. 2317. Even if the reliability of a confidential source is not clearly established, the credibility of the statement is "enhanced" when the statement gives a detailed account of events that is corroborated By the statements of other confidential informants. United States v. Hernandez-Escarega, 886 F.2d 1560, 1566 (9th cir. 1989) ("Although the reliability of several of [the] Confidential Sources was not clearly established, the detailed nature of their stories enhanced their credibility.") Given that multiple statements given By multiple sources can enhance the credibility of the information, The

2

Question now is whether the eight statements made against Mr. MENDOZA Between 2018 through 2021 During Phase one of the investigation that took place two AND A HALF YEARS prior to anymore investigation and activity related to mr. Mendoza taking Place, supported A finding of Probable cause to issue a search warrant for Apartment C123 on April 22, 2024, for finding evidence of narcotic trafficking.

The facts submitted to the magistrate must provide A substantial Basis for the Judge to conclude that the object of the search is probably on the premises to Be searcHED At the time the WARRANT WAS ISSUED. GAtes, 462 U.S. At 239, 103 S. Ct. 2317; DurHAM v. United States, 403 F.2d 190, 193 (9th Cir. 1968). "the MOST convincing proof that the property WAS IN POSSESSION of the Person or UPON the Premises at some remote time in the Past will not Justify A Present invasion of Privacy." DurHAM, 403 F.2d at 193. Neverless, evidence of "the existence of a widespread firmly entrenched AND ON GOING NARCOTICS OPERATION" Diminishes A DeFeNDANt's staleness arguments.

The Affiant, OFFICER EDWardo MAGANA, evidence of Drug trafficking and money laundering would Be found at apartment C123, garage unit 1, and garage Unit 2. To conclude that the information set forth in the application Affidavit was not Stale and was sufficient To establish that

3

their was probable cause to believe evidence of Drug Trafficking And money laundering would be fund At the locations listed. we can look BACK At Precedent case law to further guide this inquiry. IN United States v. Hernandez-Escarsega, the court upheld A "WARRANT Based in part of information almost 2 years OLD Regarding Defendant's involvement in widespread narcotics conspiracy." 886 F.2d at 1566. Like in Mendozas case, multiple individuals relayed information in regards To Hernandez's Drug smuggling operation, But the Details AND Evidence in Hernandez case were far more Explicit AGAINst Him. For example, Agent JOHNSON's Affidavit included Statements made from Five Different sources — Hernandez's Former Paramour, confidential source 1, confidential source 2, confidential source 3, AND CONFIDENTial Informant 4, who provided the following statements Against Hernandez-Escarsega:

1. Former Paramour, Rose Mary Rosales: Rosales Described Her Participation" and Hernandez orchestration of extensive smuggling activity spanning several Years. she indicated that Hernandez was involved in a Major Drug trafficking operation; Estimated that she Handled Millions of Dollars for Hernandez in connection with his narcotic activities; proceeds were used from Hernandez Drug smuggling to invest in legitimate Business and real estate; Rosales story was corroborated Both BY Her Arrest in 1974 for transporting approximately

4

400 Pounds of Marijuana, AND By statements MADE confidential source 4 Attesting to the Fact; Hernandez AND Rosales were engaged in Drug smuggling During the seventies AND Early eighties Given the wealth of incriminating information.

2. Confidential source 1 (CS1): CS1 gave A specific description of pea cock's Arrest (A co-conspirator of Hernandez) in mexico during 1987 and Hernandez subsequent effort to obtain the release of peacock and His plane. Peacock later told CS1 that Hernandez paid one million dollars to the Mexican Police to effect his release AND the release of His marijuana-stocked Aircraft. Also gave information regarding Hernandez involvement in cocaine smuggling

5. confidential source 3 (CS3): Indicated that Hernandez received and Distributed 20 Tons of Marijuana during December 1983 and January 1984. Stated Hernandez And another individual almost totally controlled the Marijuana market in the Los Angeles Area. Also stated that Hernandez had opened A BAR in Arizona Called the "Cat Palace" which was used to launder money.

Given the wealth of incriminating information detailed in the affidavit, the court HAD little difficulty concluding that a substantial. A substantial Basis for probable cause. Numerous individuals testified

To the Fact that Hernandez involvement with Drugs Have Been Far from casual for over ten Years. Although the reliability of several of Johnson's confidential sources was not clearly established, the detailed nature of many of their statements and interlocking nature of their stories enhanced their credibility. United States v. Landis, 726 F.2d 540, 543 (9th cir. 1984)("interlocking tips from Different CI's enhance the credibility of each." (citations omitted)), cert. Denied, 467 U.S. 1230, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984); see also Gates, 462 U.S. at 234, 103 S.Ct. at 2330(" explicit and detailed Description of alleged wrong Doing" entitles tip to greater weight")

Hernandez argued that the information was stale, claiming the most reliable information Described in the Affidavit related to events occurring in December 1983, over 20 months Before the warrant was issued. The Court Stated the Affidavit Detailed numerous instances of His involvement with Drugs throughout the prior Decade. The affidavit established the existence of a wide-spread, firmly entrenched, and ongoing narcotics operation in which Hernandez played a pivotal Role. In such circumstances, staleness arguments Lose much of their force.

These Details were not shown in the Mendoza investigation. For example, Between all the information conveyed Between all eight sources To Law enforcement were specifically for the time period of 2018 through 2021, and

the facts learned include the following:
(1) MENDOZA lived At APARtMent FN 48 of the WOODLAND GREEN APARTMENTS; (2) MENDOZA HAD Access to Several HIGH-END VEHICLES (3) MENDOZA Allegedly operated AS A SOURCE OF NARCOTICS primarily FentanyL; (4) That MENDOZA was pontentionally working with his yet imprisoned Brother GABRIEL, AND the MENDOZA DTO.

CONCLUSION: given ALL the facts learned From phase one's investigation may have provided reasonable suspicion to Believe That Mr. MENDOZA was A Narcotic Trafficker Between that time frame, (2018-2021) It DID Not establish probable cause or reasonable suspicion that evidence of Drug trafficking and money Laundering would Be found in the Kingsgate Apartment C123 on ~~Xxxxx~~ April 22, 2024, over two years Later. Not only was the information Stale, But none of these sources ever witnessed or stated anything related to criminal activity happening at apartment C123, nor is their any evidence they knew About the Apartment or Mr. MENDOZA'S Dealings After 2021. The caseLAW on Staleness is instructive. Information offered to support A Search Warrant Application Becomes stale when enough time has elapsed such that There is no longer "Sufficient BAsis to Believe... that the items to be seized are still on the Premises." United States v. Lacy, 119 F.3d 742, 746

(4th Cir. 1997)(Quoting United States v. Gann, 732 F.2d 714, 722 (9th Cir. 1984)). To Avoid Staleness, "[T]he facts must show that the property to be seized was known to be at the place to be searched so recently as to Justify the belief that the property is still there at the time of the issuance of the search warrant." Durham, 403 F.2d at 194. Although A Mere lapse of substantial Amount of time, "Does not undermine" A WARRANT if "a continuing Pattern or other Good reasons" suggest that the evidence sought remains in the location to Be searched, Lacy, 119 F.3d at 745-46. A significant gap in time can diminish the probability that the evidence will Be uncovered in the search, see DURHAM, 403 F.2d at 195. In other words Because evidence can be moved or Disposed of, the Affidavit must support an inference that it is presently in the residence to Be searched, regardless of its PAST Position. United States v. Grant, 682 F.3d 855, 12 Cal. Daily Opp. Serv. 6372, 2012 Daily JOURNAL D.A.R. 770 (9th Cir. 2012) Given the guidelines set By Precedent 9th circuit case law, Phase one's investigation By its self Does support that the property to be sought will Be found at Apartment C123. Though the case established Facts that Hermandez was involved in money laundering, The Affiant Here set forth any reasonable inference that evidence of money laundering would Be found nor Facts establishing that MENDOZA was ever involved in laundering money.

## PHASE TWO OF the INVESTIGATION:

crimes of DisHonesty have an adverse Affect on the credibility of confidential informants. see united States v. Reeves, 210 F.3d 1041, 1045 (9th cir. 2000). IN the Absence of countervailing evidence to Bolster the Informants credibility or the reliability of the tip, AN INFORMANTS criminal PAST involving DisHonesty is FATAL to the reliability of the tips information and His or Her Testimony cannot support PROBABLE CAUSE. AGENT MAGANA STATED SOurce of Information 2 (SOI-2) WAS Not suitable to Be A confidential Source Due to His extensive criminal History, which includes numerous convictions For Crimes of DisHonesty, including THEFT (misDeMEANOR and Felony), Burglaries, inDecent Liberties, AND Being A Registered SEX OFFENDER. The information conveyed BY SOI-2 included the Following:

(1) Mr. MENDOZA HAD Been Living at the apartments near the shell gas station in Horn Rapids since LAte October of 2023; (2) Mr. MenDOZA is involved in Drug Trafficking and always carries a firearm; (3) Mr. MenDOZA would SHOot At LAWenForceMENT if they ever came to Arrest Him; (4) Mr. mendoza has an AGGressive Personality; (5) Mr. MenDOZA Drives expensive cars and wears Designer clothing; (6) Possible Access to 19 veHicles: Jeep Track HAWK, DODGE

Hellcat Charger, Mercedes Benz G-Wagon, AND BMW M3; (7) Mr. Mendoza Drives with No License Plates AND will Run From Police if they try to stop Him; (8) Mr. Mendoza Considering Turning Himself in on His Felony Assault But His Brother in Mexico HAD ADvised AGAINst it Due to Possible Pending Federal Case AGAinst HIM; and (9) Mr. Mendoza Holds Approximately 150,000 in US. Currency At APArtment C123; (10) mid November of 2023 Mendoza went to Los Angeles, CAlifornia to PARty AND CAME BACK with 4 to 5 Kilograms of cocaine, one GALLON ziploc BAG of Fentanyl, AND AN UNKnown Amount of Methamphetamine; (11) Approximately September of 2023, Mr. mendoza Delivered 2 Kilograms of cocaine to A Buyer At the Richland WAlmart.

Though SOT-2 claims these alleged illegal Activities took place, never claimed How he knew the information, what His Basis of knowledge was. Given that SOT-2 Did not specify the exact Apartment complex, the apartment nomBer, nor Did the vehicles he mentioned line up with the vehicles Law enforcement observed At the vicinity Horn Rapid APArtments, it's reasonable to assume this information was given to him By a third party who knew mr. mendoza. Additionally, SOT-2 only states allegations of criminal Activity taking place outside of the vicinity Horn Rapid APArtments, never Any Drug activity or criminal Activity actually

TAKING PLACE IN the residence, OR Directly outside the residence or even near the residence of Apartment C123 Not one time. SOI-2 never states narcotics ever being seen or stored At the Apartment nor anything in regards to Mr. Mendoza LAUNDering Money. Because SOI-2's Basis of Knowledge is never established, never Stated and Drug activity or criminal activity was Not taking place at Apartment C123, AND Had Crimes of Dishonesty with no prior track record of providing reliable information in the past, SOI-2's Statement, Standing alone, Does not provide sufficient evidence to establish probable cause to search Apartment C123. For evidence of Drug trafficking and money laundering.

PROBABLE cause for a search Warrant Requires a "fair probability that contraband or evidence of a crime will Be found in a particular place, Based on the totality of the circumstances." Dawson v. City of Seattle, 435 F.3d 1054, 1062 (9th cir. 2006).

When Looking At all the information given from all nine Sources, the information collectively ADDed together does not establish A fair probability of narcotics, money laundering, or evidence of Both, will Be found At Apartment C123, nor was it ever conveyed To law enforcement that it would Be. Therefore the witness Statements DO not provide the Required

Level of information or evidence to establish probable cause to issue the search warrant.

GARBAGE RUN #1: On February 2, 2024 surveillance was conducted At Apartment C123. LAW enforcement observed Two Large filled Black garbage Bags with Blue draw strings sitting outside on the Rear porch of C123. Law enforcement contacted the Apartment Manager Requesting them to MAKE contact with the occupant of C123 (Registered To Mr. Lopez-Casarez) AND Ask of them To Dispose of the GARBAGE BAGS, in which the Resident stated they would Dispose of them After WORK. At Approximately 7:00 PM LAW ENFORCEMENT Quit Physically surveilling Leaving Behind A temporary video surveillance PLATFORM for continued Recording. Prior to LAW ENFORCEMENT departing, special Agent Deikering opened two community trash Bins At the southside of the APARTMENT complex PARKing Lot, which were most convienant for the RESIDENT(S) of Apartment C123 To utilize for Disposal of GARBAGE. Both trash Bins were lightly filled with white plastic garBage Bags and CARDBOARD Boxes. SA Deikering Anticipated returning the following morning to Determine whether the Black Bags Had Been Disposed of. When Law enforcement Later reviewed the footage from February 2, 2024 at 7:20 PM Footage captured A Male Resembling

12

MENDOZA-AYALA wearing A HOODED Sweatshirt exit the BACKDOOR of ApartmenT C123 AND HANDLED the garbage BAGS briefly before returning inside the residence. A few minutes Later the SAME MALE WEARING A HOODED Sweatshirt exit the BACK DOOR of APARTMENT C123, picked up the two BLACK GARBAGE BAGS from the Porch, AND carried them AWAY, WALKing southeast TOWARDS the Direction of the trash Bins previously IDENTIFIED At Approximately 7:25 PM, The SAME INDIVIDUAL returned to the porch NOthing in HAND, AND entered ApArtment C123. The following DAY ON February 3, 2023 (A Year Prior to the February 2 Trash Pull), SA Deitering returned to ADARTMENT C123 AND noticed the BLACK BAGS HAD BEEN REMOVED from the PORCH. Inside the community trash Bins, SA Deitering easily identified the only two (2) BLACK plastic GARBAGE BAGS in the community Bins AND Retrieved them. The BAGS APPEARED TO BE the SAME two BLACK GARBAGE BAGS that HAD Been on the PORCH OF Apartment C123 the previous evening, AND that were later disposed of BY the male wearing the HOODED Sweatshirt from the surveillance video. The two Black GARBAGE BAGS HAD Been tied in A Knot BY the BLUE Draw string. SA Deitering transported the GARBAGE BAGS A SHORT DISTANCE AWAY so that the contents of the Bags could Be further examined. UPON further examination, SA Deitering found one

13

USED/TORN OPEN FOOD SAVER CLEAR PLASTIC VACUUM-SEALED BAG CONTAINING WHITE POWDER RESIDUE ON ALL SIDES, SUSPECTED TO BE FENTANYL POWDER. THE BAG WAS LARGE ENOUGH TO HOLD APPROXIMATELY 1-2 POUNDS OF POWDERY SUBSTANCE. THE BAG TESTED POSITIVE FOR FENTANYL. OTHER ITEMS OBSERVED WERE LARGE AMOUNTS OF USED BABY DIAPERS, TAMPONS, MARIJUANA PRODUCTS AND MULTIPLE FAST-FOOD PACKAGING. NO ITEMS OF DOMINION WERE RETRIEVED.

Issues with GARBAGE PULL #1:

(1). The individual in the video surveillance is never Identified.

(2). The surveillance video never shows the un-identified individuals disposal of the trash Bags into the community trash Bins, nor where the individual took the trash Bags too.

(3). LAW enforcement never observed How, when, or By whom the trash Bags Found were disposed, As well no footages of the Front Door.

(4) The affiant stated that SA Deitering retrieved the trash Bags on February 3, 2023, A whole entire year Before the un identified individual carried Away the Black trash Bags on the Back porch of Apartment C123 To an unknown location. Because the magistrate is bound to the information contained within the four corners of the WARRANT For establishing Probable cause, This is not sufficient to support the relation of trash Bags one

14

Your apart as being the exact same trash bags shown in the surveillance footage on February 8, 2024.

(5) Even assuming the date listed for retrieval of the trash bags on February 3, 2023 was a clerical error. The time between ~~illegible~~ the unidentified suspect in the surveillance footage and when SA Deitering returned the following day for retrieval of the trash bags inside the community trash bin was extensive (10 or more hours), In which anything could have taken place. Without surveillance of the actual community trash bins themselves, Its to reckless to assume those bags were the same exact bags seen on the porch of Apartment C123.

(6) With no dominion or indicia linking Mr. Mendoza or Apartment C123 to those trash bags retrieved from SA Deitering, There's to many possibilities verse probabilities to establish a sufficient nexus between either Mr. Mendoza or Apartment C123 and the contraband ammo in those black trash bags.

GARBAGE PULL #2: On February 12, 2024, SA Deitering went to the vicinity Horn Rapids Apartments to check for black bag(s) with blue drawstrings, located in previously identified community trash bins. SA Deitering located three (3) black filled trash bags with

BLUE DRAW Strings NEAR ONE ANOther AND Retrieved them for further inspection. No other BLaCK trash BAGS Were found. SA Deitering found six(6) clear plastic Sandwich BAGGies that were ZiPLoc Style containing white PowDer Residue suspected of Fentanyl. One of the BLACK GARBAGE Bags HAD Four(4) BAGGies that Were contained in one another, of which one Baggie HAD "30" writteN ON it iN BLACK MARKer. The other two(2) BLACK GARBAGE BAGS contained One(1) BAGGie EACH. TRUe NARC Field test ON the PowDer Residue tested Positive for fentanyl. A fingerPrint suitable for comparison was also found On a Baggie, However it was Not A Match to MENDOZA-AYALA OR ANY known subject ON File. The contents within the trash were consistent with the Previous trash Pull A week prior, which included BABY Diapers, marihuana products, and many fast food to-go Bags. ADDitionally, BaBy Diapers AND numerous matching white Rubber gloves were found in each of the three(3) Black GARBAGE BAGS APPEARiNg to investigators to Belong to the SAMe HouseHOLD. No Dominion was found in the BLACK GARBAGE BAGS. However, A Safeway Grocery Receipt was found in one of the Bags. The receipt indicated that it was from the SAFEWAY Located at 1803 George WASHington WAy, RichlAND WA. The receipt Also indicated that the purchaser used self-check out DAteD February 10, 2024, at 10:08 PM. ON FeBruAry 13, 2024, the AFFiANt, OFFICer MAGANA,

reviewed SAFEWAY surveillance video footage associated with that transaction. Surveillance footage indicated that A group of three(3) Hispanic males made the Purchase, none of which was Mendoza-Ayala or Lopez Casarez.

## Issues with GARBAGE PULL #2:

(1). There was no observation During physical or video surveillance of Any individual exiting Apartment C123 with Black trash Bags and no physical or video surveillance of trash Bags placed outside or near Apartment C123 prior to SA Deitering conducting the garbage Pull. A matter of fact, there was no surveillance conducted whatsoever to possibly link anybody to those trash Bags - Not By whom, How, or when they got placed into the community Bin

(2). The fingerprints retrieved from this trash pull Did not Match Mendoza-Ayala nor any other subject on File.

(3). Once Again their was no Dominion or indicia Linking either Mr. Mendoza or Apartment C123 to the Contraband fund in the trash Bags

(4). LAW ENFORCEMENT failed to thoroughly investigate the three Hispanic males shown to Be associated to the SAFEWAY receipt AND Directly linked to the trash Bags containing this Drug Trafficking contraband. SA Deitering could have subpoenaed the purchase records to identify the owner of the VISA Credit Card ending in DIGITS

17

8517 As shown on the receipt Law enforcement Had photographed. (see Exibit # 00000138) In Doing so could have Helped Law enforcement IDentify the source of the contrabann and possibly the Apartment Unit from which those trash Bags had come from. This was a Huge MISTAke for law enforcement for it could of Been the very evidence excluding Mr. MENDOZA from Any involvement or asssoci Association To that contraBAND.

(4) without Any Surveillance of Apartment C123 or the community trash Bins prioring to conducting the February 12, 2024 trash pull, it's to unreasonable to assume that mr. mendoza or Apartment C123 Are the only occupants or individuals utilizing the community trash Bins for garbage Disposal that use Black trash Bags with BlueDrawstrings.

GARBAGE PULL #3: ON February 19, 2024 another trash pull was conducted By SA Deitering At the vicinity Horn RApiD Apartments. During the visit, SA Deitering collected two(2) filled Black trash Bags with Blue Draw strings in the community trash Bins. There were no other Black trash Bags in the community trash Bins. In one of the trash Bags SA Deitering found multiple Aluminum foil pieces with Burn marks appearing to Be utilized for fentanyl consumption. In one of

18

the pieces of foil contained one(1) Blue-Purple Pill Appearing to Have Been Partially Burned fentanyl Pill For consumption. this pill later tested Positive for fentanyl. Inside Another piece of Burnt aluminum made into A Bowl shape, was Blue-purple residue suspected to contain fentanyl. It appeared that multiple Pills were partially Burned in the cavity of the Bowl for consumption. The residue later tested positive for fentanyl. In addition, Five(5) Fingerprints suitable for comparison was found on four pieces of foil, AND ALL five Matched the fingerprints record on file of MENDOZA-AYALA. THe other contents within the BLACK trash BAGS were consistent with the previous trash Pulls, including BABY Diapers, marijuana Products, And many fast food to-go Bags. No dominion was found.

Issues with GARBAGE PULL #3:

(1) NO physical or video surveillance To show when or BY whom Discarded of the trash Bags.
(2) NO Dominion or indicia for Apartment C123
(3) NO evidence of Drug trafficking only personal use that was Discarded

The facts in this case Are very similiar to united States v. underwood, 725 F.3d 1076 (9th Cir. 2013), in which evidence was insufficient for establishing the search warrant of underwood residence. In underwood, Between January 2010 and July 2010, The DEA AND Beverly Hills Police Department

19

conducted a wiretap investigation into a suspected DTO headed by Underwood's co-defendant, Jimmy Luong. The investigation revealed that Luong's DTO was likely distributing hundreds of thousands a pills of ecstacy per week. In April of 2010, Agents followed Luong and Tony Barrera, another one of Underwood's co-defendants from Barrera's residence to a Home Depot Parking Lot. There agents observed Luong and Barrera meeting with Underwood and transfering two large unmarked crates from Underwood's vehicle to their own. Agents used surveillance to track the two crates to a Luong DTO stash House where the crates were subsequently seized and found to contain thousands of ecstacy pills. On July 22, 2010 Federal Agents assisted local law enforcement including Los Angeles Police Department Detective James Kaiser, simultaneously execute federal arrest warrants for 17 suspected co-conspirators of Luong's DTO and federal search warrants for 15 residences stash Houses, and vehicles. One of the federal search warrants was executed at a House believed to be Underwood's on Cantrece lane in Cerritos, California. When officers arrived they only found Underwood's mother, who told them Underwood actually lived on Mansa Drive in La Mirada, California. Later that Day, At the Mansa Drive House, agents arrested Underwood and conducted a protective sweep of the House. During that sweep agents observed

A clear zip-lock BAG containing A personal Amount for use of marijuana on a table in the living room. Following underwoods refusal to consent to a full search of the House DEA Agent JOHNSON instructed Local officers to obtain A state search WARRANT for the MANSA Drive House as soon as possible. LAPD Detective Kaiser was assigned the task of securing the warrant. To assist Kaiser with the task, JOHNSON mailed Kaiser A summary of the case AGAINST underwood based on the federal Affidavit AND AN explanation on why JOHNSON Believed evidence would Be found At the MANSA Drive House. underwood filed A motion to suppress the evidence seized from the Mansa Drive House. Underwood argued that the Affidavit supporting the state warrant for the MANSA Drive House LACKED Probable cause. The District Judge GRANTED the Motion to suppress. In A lengthy, scholary order, Judge wilson concluded that the Affidavit supporting the state warrant Lacked probable cause Because the Affidavit set forth mostly conclusory Allegation and only two facts - underwood's delivery of undescribed crates to Lwong three months Before the Warrant application and an observation of personal use amounts of marijuana in underwoods Home. The District court further concluded that the good faith exception Did not Apply Because the Affidavit Did not make a colorable showing of Probable cause, and was thus A Bare Bones

21

Affidavit. The 9th circuit court Agreed. Affirmed the Motion to Suppress. Stating the fact Agents observed Underwood Deliver Two wooden crates to Luong AND BARRERA on one occasion three months Before the warrant Application HARDLY supports the conclusion that Underwood is A Drug courier working for Luong. The Affidavit Does not Make Any other factual Assertions indicating that underwood made other Deliveries to Luong and Barrera or even contacted Luong and Barrera at any other time. Moreover, the Affidavit neither included a Description of the crates, nor Any other facts that would indicate that the crates contained ecstacy. The court stated we afford little weight to the statement "Based on other seizures in this investigation, I Believe the crates contained approximately 260,000 pills of MDMA."

Just like in Mendoza's Case, except here, LAW enforcement Never Identified positively when, How, or By whom the Black Trash Bags were Discarded. The fact that law enforcement observed an unknown individual Deliver two (2) Black trash Bags with Blue Drawstrings to an unknown location on one occasion (February 2, 2024) nearly three months Before the search warrant application Does not support the inference nor conclusion that Mr. Mendoza is A poly-Distributor for the Mendoza DTO AND that evidence of Drug trafficking AND money laundering would further be found in Apartment C123 of the vicinity Horn Rapid Apartments.

22

Just like in Underwood, the Affidavit never indicates that Anymore known or unknown individuals were observed ever Again Delivering Black trash Bags with Blue Drawstrings from Apartment C123 or any other location to the community trash Bins Before law enforcement went and Retrieved the trash Bags on February 12, 2024 and February 19, 2024. Additionally, Just as officers tried to link the crates that Underwood Had Delivered at the Home Depot parking Lot to Luong and Barrera to other crates found in stash Houses of the same investigation, in which the crates contained ecstacy, therefore those crates also containing ecstacy, was an insufficient assumption to establish probable cause for the manza Drive House; the same goes here, in regards to Drawing the conclusion that the February 12 and February 19 trash Bags came from Apartment C123, Because they had Blue Drawstrings Just like the trash Bags observed February 2 outside of Apartment C123 on the Back porch, would Be asking the magistrate to Have to Draw to many Inferences.

The one and only TRASH pull that can, without A Doubt, Be connected to Mr. Mendoza is GARBAGE Pull #3, in which, Mendoza's five (5) fingerprints lifted from the Discarded personal possessory use of fentanyl pills, Matched up with Mr. Mendoza. This trash Pull is also very

Case 4:24-cr-06011-MKD ECF No. 117 filed 08/10/26 PageID.924 Page 23 of 36

significant because its the only GARBAGE Pull that DID not contain evidence of Drug trafficking, which were found in both previous GARBAGE pulls on February 2, 2024 and February 12, 2024. ADDitionally, the February 2 and February 12 trash pulls HAD NO evidence of Fentanyl use whatsoever.

Jumping Back to "united States v. underwood, A similiar issue was addressed regarding personal use. In underwood, the AFFIDAVit Described Detective DAVIS's observation of A Baggie of personal use Amount of Marijuana At underwoods MANSA Drive Home During the protective sweep. the 9th Circuit stated Although this Description is A sufficiently Detailed Factual, it lacks A Nexus with ecstacy trafficking and therefore Does not support the conclusion that UNDERWOOD is A ecstacy trafficker. The Circuit further stated that Both the Amount AND the type of Drug observed was important. As Kaiser's AFFIDAVit explained Drug TRAffickers often keep evidence of their trafficking Activities such as their inventory of Drugs, CasH From Sales, AND records From Sales—at their Homes. thus, if Police had observed A Large Amount of Drugs in underwoods Home, especially with combination with A Large Amount of CasH or apparent Drug Business records, this would support the conclusion that UNDERWOOD is A Drug trafficker. But All that was observed was A Personal use Amount of Marijuana in underwoods Home, which only supports an inference that underwood uses

marijuana, A Drug entirely Different from ecstacy, and it certainly Does not indicate that he is A ecstacy trafficker. See United States v. Vizcarra-Martinez, 66 F.3d 1006, 1016 n. 8 (9th Cir. 1995)(Holding "evidence of Drug Use or mere Possession Cannot Be Used to prove that the DefenDAnt possessed A Different type of Drug with intent to Distribute" Because the relationship Between the two are so Attenuated). Thus, the personal Use of marijuana observed in Underwood's Home fails to support the conclusion that UnDerwood is A courier for an ecstacy trafficking organization or that evidence of such trafficking would Be found At UnDerwoods Home. "Drug possessed for mere Personal Use are not relevant to the crime of Possession with intent to Distribute Because they Are not "PARt of the SAMe course of conDuct" or "COMMON Scheme," as Drugs intended for Distribution." U.S. v. Kipp, 10 F.3d 1466 (9th Cir. 1993).

The observation of fentanyl Personal Use on February 19, 2024 in GARBAGE Pull #3 DiD not support Probable cause—either alone or in conJunction with the other Statements and facts in the Affidavit—To Search Apartment C123 for evidence of Drug trafficking and money laundering. The fourth Amendment requires "A nexus... Between the items seized and criminal Behavior." WARDEN v. HAYDEN, 387 U.S. 294, 307 (1967). Here the items sought in

in the Search, including Any and all controlled substances; records related to the purchase, importation, transportation, sale, Distribution and possession of controlled substances; Records related to the Attempt By Drug Traffickers to legitimize profits from the sale of Drugs — may reasonably have a nexus to what the Affidavit Stated, that Mr. Mendoza was a poly-Distributor for the Mendoza DTO and was Laundering money of Drug proceeds. However, the items Do not have A Nexus to the possession of a small Amount of personal Fentanyl use. Nor Does the observation AND ~~finding~~ Findings of a personal use amount of Fentanyl create a reasonable inference that evidence of Drug trafficking AND money Laundering would Be present At Apartment C123.

CONCLUSION:

Unreasonable Government intrusion into the Home is the chief evil Against which the Fourth Amendment is Directed. PAYTON V. NEWYORK, 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed.2d 639 (1980). The Fourth Amendment Prohibits A GENERAL warrant. BOYD V. United States, 116 U.S. 616, 625, 6. S. Ct. 524, 29 L. Ed 746 (1886); Andresen V. MaryLAND, 427 U.S. 463, 480, 96 S. Ct. 2797, 49 L. ED. 2d 627 (1976). In issuing A Search warrant, A Nuetral Judge must Determine that there is A "fair probability that... evidence of A crime will Be fand in a particular place." illinois V. GAtes, 462 U.S. 213, 238, 103 S. Ct. 2317, 76

L.Fd.2d 527 (1983) (Quoting Jones v. United States, 362 U.S. 257, 271, 80 S. Ct. 725, 4 L.Fd.2d 697 (1960)). (Quotations omitted). "Probable cause is determined by looking at the totality of circumstances..." United States v. Nielsen, 371 F.3d 574, 579 (9th cir. 2004). In determining whether probable cause exists established for the search, the court considers information provided to the judge issuing the warrant, including reasonable inferences drawn by the affiant. 2 Lafave, Search and Seizure, §3.2(d) (4th ed. 2008) At 49 [Here in After "Lafave"]. However, "probable cause cannot] be made by affidavits which are purely conclusory, stating only the affiants or an informer's belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based." United States v. Ventresca, 380 U.S. 102, 108-09 (1965) (internal quotations omitted); see also Gates, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and... wholly conclusory statement[s]... fail[] to meet this requirement."); United States v. Dubrofsky, 581 F.2d 208, 212 (9th cir. 1978) (A search warrant may not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances."). The requirement that the affidavit recite the facts relied upon by the

27

Case 4:24-cr-06011-MKD   ECF No. 117   filed 08/10/26   PageID.928   Page 27

the Affiant to support the conclusion that probable cause exists is simply a part of the larger principle that the official charged with the acting on the Affidavit must be able to judge for himself the persvasiveness of those facts, as well as make an independent determination that they establish probable cause." United States ex rel. GRANO v. Anderson, 446 F.2d 272, 275 (3d Cir. 1971).

Probable cause to believe that a suspect has committed a crime is not, by itself, adequate to obtain a search warrant for the suspect's Home, United States v. Ramos, 923 F.2d 1346, 1351 (9th Cir. 1991). the Affidavit must Demonstrate "reasonable cause to believe that the things listed as the objects of the search are located in the place to be searched." Id. the Supreme court has clearly stated that gut Feelings and inarticulable "Hunches" Do not equal Reasonable suspicion, let alone, probable cause. Wardlow, 528 U.S. at 123-24; Terry, 392 U.S. At 27. the Supreme court has stated that "the critical element in a reasonable search is not that the owner is suspected of a crime, but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978). Probable cause for a search requires a "fair probability that contraband or evidence of a crime will be found

in a particular place, Based on the totality of the circumstances." Dowson v. City of Seattle, 435 F.3d 1054, 1062 (9th Cir. 2006). The most convincing proof that the Property was in Possession of the Person or upon the premises at some remote time in the past will not justify a present invasion of privacy." Durham v. United States, 405 F.2d 190, 193 (9th cir. 1968). ~~Secondary considerations~~

Based on the totality of the evidence in this case was insufficient in establishing probable cause. For starters, All eight sources who gave statements against Mr. Mendoza Between 2018 - 2021 in Phase one of the investigation were stale. Not only were they 2 and a 1/2 years old, But none of their information conveyed had any connection to Apartment C123, nor was their any reason to Believe they knew Mr. Mendoza was still involved in possible Drug trafficking, and that he was using Apartment C123 As His place of Residence OR His operational Base to store narcotics. Secondly, SOI-2 was an unsuitable candidate to Be an informant Based on numerous crimes of Dishonesty (Both Felony AND misdemeanor) Theft Convictions, HAD No past track record for providing Reliable information to Law enforcement, Nor was His Basis of knowledge ever established. Additionally, SOI-2 made Allegations of criminal Activity Against Mr. Mendoza, But none which

29

included Being conducted or witnessed At the vicinity Horn RAPID Apartment C123. The vehicles SOI-2 listed off to Law enforcement As Being connected to Mr. Mendoza were not the same vehicles Law enforcement Identified As Being Associated to Mr. Mendoza At the vicinity Horn RAPID Apartment complex. Third, Law enforcement never conducted Any control Buys, pen registers, wiretaps or gps tracking. Moreover, LAW enforcement never witnessed Foot traffic, vehicular traffic, hand to hand transactions - nor observe Mr. Mendoza ever in possession of narcotics. Next, During the february 2, 2024 GARBAGE PULL (#1), Though observed Black trashBags with Blue Drawstrings placed on the Back Porch of Apartment C123 - Law enforcement never identified the individual who carried them away From the Porch or see the location they were Brought too. Assuming the clerical error stated on the Affidavit regarding the retrieval of the trash Bags from the community trash Bins the following Day, February 3, 2024, the 10 or more. Hours in Between the Unknown individual AND SA Dentering was extensive, in which Anything could have happened in Between. ADDitionally, their was no Dominion or indicia located in those trash Bags. The February 12, 2024 garbage pull was followed By no physical or video surveillance whatsoever. Law enforcement never observed Anyone Handle or Dispose of Black trash Bags with Blue Drawstrings

30

Case 4:24-cr-06011-MKD    ECF No. 117    filed 08/10/26    PageID.931    Page 30 of 36

Between the initial February 2, 2024 trash pull And this one nor does SA Deitering ever establish a reason for why he chose February 12, 2024 to conduct it. Additionally, fingerprints that were recovered from the February 12 trash pull did not match Mr. Mendoza or any other subject on file known. The safeway receipt recovered with the february 12 trash pull gave law enforcement a lead and were able to aquire the self-checkout video footage that was associated to that purchase in which gave them three Hispanic males, neither mendoza or mr. lopez. Moreover, law enforcement had a chance to subpoena the records related to that purchase Because a visa credit card Had Been used — which could of not only linked the owner of the card to the contraband But could of also gave them a address unassociated to mr. mendoza or apartment c123, which would have excluded any involvement. That Luck of Follow up investigation was a huge mistake from law enforcement. And once again no indicia or nominion were located. And finally, the third and last garbage pull conducted on February 19, 2024, contained no evidence of Drug Trafficking whatsoever. Although 5 fingerprints matching mendoza were retrieved — it was only proof showing that Mr. mendoca was a fentanyl user not a fentanyl trafficker. And just like the February 12 trash pull

Case 4:24-cr-06011-MKD    ECF No. 117    filed 08/10/26    PageID.932    Page 31 of 36

31

The affidavit never explains why SA Deltering chose to do the trash pull on that day, for their was also no physical or video surveillance prior to conducting it. And once again no Dominion or indicia were recovered. Given the facts listed above the affidavit did not establish probable cause. The observation of personal use coupled with the February 2, 2024 surveillance of An unidentified suspect Delivering trash Bags to an unknown destination on one occasion does not tend to show that Apartment C123 contained evidence of Drug Trafficking AND money laundering nearly 3 months later, Based on All the trash Bags Being Black with Blue Drawstrings.

## The GOOD Faith Exception Does not APPLY:

If a warrant lacks probable cause, evidence obtained during its execution should generally Be suppressed under the exclusionary rule. ~~the police officers~~ ~~officers~~ MAPP v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961); Weeks v. United States, 232 U.S. 383, 393, 34 S. Ct. 341, 58 L.Ed. 652 (1914). While the Supreme Court has articulated various rationales for the exclusionary rule, the rule's Primary Purpose has Been to Deter Law enforcement from carrying out unconstitutional searches and seizures. Although the exclusionary rule is often framed as a nuisance to law enforcement, we view it as a promoter of police professionalism ~~Because~~

professionalism, rule and education. See Herring v. United States, 555 U.S. 135, 156 n.6, 129 S. Ct. 695, 172 L.Ed.2d 496 (2009)(noting that "proffessionalism and education is a sign of the exclusionary rule's efficacy..."). The exclusionary rule has helped police more effectively secure good evidence without violating the law AND the rights of American citizens. See, e.g., Myron Orfield, the exclusionary rule: A prosecutors defense, 1 Crim. Just. Ethics 28, 31-32 (1982). The rule has also improved the quality of police, training, education, AND case reporting. See Wayne LaFave, search and seizure: A treatise on the fourth Amendment § 1.2 (b) at 33 (4th ed. 2004); Yale Kamisar, public safety v. individual liberties: some "facts" and "theories", 53 J. Crim.L Criminology & Police Sci. 171, 179-81 (1962); Orfield, supra, at 1028, 1040; Sachs, supra, at 31-32. Despite the benefits of the exclusionary rule, significant exceptions to the rule have Developed under these exceptions, evidence seized pursuant to a Defective warrant will not be suppressed. One such exception is the "good faith" exception established By Leon, which is satisfied if an officers acks "in objectively reasonable reliance" on the warrant. 486 U.S. at 922, 104 S. Ct. 3405. To Determine whether the officers acked in objectively reasonable reliance, "all of the circumstances - including whether the warrant Application had previously Been rejected By a different magistrate may be considered." id at 922 n.33, 104 S. Ct. 3405; see also Messerschmidt v.

33

Mullender ___ U.S. ___, 132 S. Ct. 1235, 1249-50 182 L. Ed. 2d 47 (2012). The Court in Leon identified four situations that per se fail to satisfy the good faith exception in these situations, "the officer will have no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922-23, 104 S. Ct. 3405. The four situations are: (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing Judge; (2) where the Judge "wholly ABANDON[S] his [or Her] Judicial Role"; (3) where the affidavit is "so lacking in indicia of Probable Cause as to render official Belief in it's existence entirely unreasonable," and (4) where the warrant is "so Facially Deficient — i.e. in failing to particularize the place to Be searched or the things to Be seized — that the executing officers cannot reasonably presume it to Be valid." (Internal Quotations omitted) If any of those four situations apply, as the 9th Circuit explained in United States v. Luong, we "need not inquire further" and can conclude that the good faith exception to the exclusionary rule Does not apply. 470 F.3d at 905. The 3rd situation which is referred to as a "Bare Bones" Affidavit Applies in This case. An Affidavit is so lacking in indicia of probable Cause or Bare Bones, when it fails to provide a colorable argument for probable Cause

Based on the facts set forth Above, the warrant Did

34

Not establish probable cause and the GOOD faith exception Does not apply Because the warrant was Lacking in indicia. For these reasons, Defendant asks the courts to grant the suppression of the Evidence ~~evidence from~~ Stemming from vicinity Horn RADIO Apartment CV23 and BOth GARAGE unit 1 and GARAGE unit 2 searches.

35



# SAFEWAY

Store 333 Dir Brian Mackner
Main:(509) 946-9605 Rx:(509) 946-1157
1803 George Wash. Wy
Richland WA 99352



0003330940329240210208

---

YOUR CASHIER TODAY WAS SELF

---

| GROCERY | | Price | You Pay | |
|---|---|---|---|---|
| 5100028207 | CAMPBELLS | 5.99 | 5.99 | S |
| **REFRIG/FROZEN** | | | | |
| 2100002483 | KRAFT MILK AMERICA | 5.49 | 5.49 | S |
| 2113004726 | LUC CHESE 4 BLEND | 2.99 | 2.99 | S |
| 2113004877 | LUC CHESE MOZZARLA | 2.99 | 2.99 | S |
| 2113007002 | 3@ L WHOLE MILK | 10.47 | 10.47 | S |
| 2113008793 | SIG IC CRM SANDWCH | 4.49 | 3.99 | S |
| | Member Savings -0.50 | | | |
| 2113008794 | SIG IC CRM SANDWCH | 4.49 | 3.99 | |
| | Member Savings -0.50 | | | |
| 2113016895 | LUCERNE EGGS LARGE | 14.39 | 14.39 | S |
| 7456200100 | CACIQUE CHSE RANCH | 4.29 | 3.49 | S |
| | Member Savings -0.80 | | | |
| **BAKED GOODS** | | | | |
| 7222000068 | FRANZ BRD BIG WHTE | 4.79 | 4.79 | S |
| **MISCELLANEOUS** | | | | |
| 22147 | 4@ RCYCBLE BAG CHARGE | 0.32 | 0.32 | T |

| | | |
|---|---|---|
| TAX | | 0.03 |
| TAX EXEMPTION | | 0.03- |
| **** BALANCE | | 58.90 |

---

Credit Purchase    02/10/24 22:08
CARD # ***********8517
REF: 650842485170  AUTH: 00156471

PAYMENT AMOUNT        58.90

---

AL VISA CREDIT
AID A0000000031010
TVR 0000000000
TSI 0000
　　Visa                58.90
　　CHANGE               0.00

***************************************

NOW HIRING!
See Store Director or visit
www.Safeway.com/Careers to apply

***************************************

| YOUR SAVINGS | |
|---|---|
| | 1.80 |
| Member Savings | |
| **Total** | **1.80** |

TOTAL NUMBER OF ITEMS SOLD = 12
02/10/24 22:08  333  94  329    8894

Thank you for shopping Safeway!
For SAFEWAY FOR U questions call
877-276-9637 or Safeway.com/foru